10 CV 5653

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED SPINAL ASSOCIATION, a           : Case no.
nonprofit organization, DISABLED IN
ACTION, a nonprofit organization,      :

                  Plaintiffs,      :

        -against-      : **COMPLAINT FOR INJUNCTIVE**
                 : **AND DECLARATORY RELIEF**

BOARD OF ELECTIONS IN THE CITY         :
OF NEW YORK and JULIE DENT, in her
official capacity as President of the Board of  :
Elections in the City of New York,

                 :

           Defendants.      :
-------------------------------------------------- x

RECEIVED
JUL 26 2010
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.      This lawsuit challenges pervasive, ongoing, and inexcusable discrimination by

Defendants, the Board of Elections in the City of New York against voters with mobility

and/or visual disabilities who seek to exercise their right to vote at their assigned polling

places.

2.      For at least a decade, Defendants have known that many polling places in

New York City are inaccessible to disabled voters. Yet, over twenty years after the

enactment of the Americans with Disabilities Act – a law Congress enacted with the express

purpose of ensuring that Americans with disabilities are able to participate equally and fully

in their communities – disabled residents of New York City still do not have equal access to

one of the most fundamental rights in this country: the right to vote.

1

In New York's 2008 General Election, for example, poll monitors found that out of 65 polling places inspected, there were 54 locations with barriers to accessibility. Similarly, of the 51 polling places in New York City inspected during the November 3, 2009 General Election, 43 had accessibility barriers. The barriers were pervasive and significant.

4.       At several polling places there were narrow doorways that prevented voters from entering a polling place. Additionally, steps that led up to main entrances often posed an impassible barrier due to consistently inadequate and often dangerous entryway ramps. These exterior ramps were commonly steep, had no edges to prevent voters from slipping off the sides, lacked hand rails which voters need to support themselves, did not have a flat landing which voters need in order to anchor themselves while pushing a door open, and ramps were also sometimes dangerously unstable.

5.       When voters were not able to enter through the front door of a polling place, they typically looked for an alternative secondary entrance.  Signs directing voters to an accessible entrance are required. Unfortunately, in New York elections adequate signage is rare.  In fact, poll site inspectors encountered signs which were missing or incorrect more than they encountered signs which helped voters to get inside.

6.       As a result of inadequate signage, voters who used wheelchairs, walkers, and canes in the past few elections too often found themselves going around buildings, confused and undirected, searching for a way to get inside their polling place.

7.       Inside, signage in the 2008 and 2009 elections was also often non-existent or insufficient.  When voters with disabilities used an alternate accessible entrance, failure to post interior signage directing them to the voting room left some voters inside a building lost without guidance.

2

8.     Voters who get inside a building but who do not know where to go are left in a predicament. Voting experts report that this situation commonly involves traversing back hallways which are littered with debris and storage items.

9.     In the last few elections, even voters who reached the room where ballots were cast all too often found the room inaccessible. Barriers at this point in the journey stemmed from setting up tables, machines, and voting stations close to one another, resulting in a cramped and crowded voting room.

10.     Poll workers reported that they received little to no training on accessibility. In the past few elections, this lack of training has been painfully obvious to voters who used mobility aids. These voters repeatedly faced rooms of voting machines which were inaccessibly cramped, and poll workers who were too often insensitive or rude to people requesting an accommodation.

11.     Where there is no path of travel in the voting room, a voter using a wheel chair, for example, would be forced into the humiliating choice between turning around and not voting, or asking poll workers to move tables and machines.

12.     Every year too many New Yorkers with disabilities are forced to make this choice when they try to be part of their community and vote alongside their neighbors at their polling places.

13.     People with vision disabilities also faced serious access barriers in the 2008 and 2009 elections. Poll inspections revealed that poll workers often had no understanding of how to identify barriers for people with vision disabilities, or how to warn people of these barriers. At one polling place, for example, there were window guards that protruded into the path that voters used to get from the sidewalk to the voting room. The window guards

3

were sharp and metal.  There was no marking to direct a person with a vision disability to step aside to avoid these window guards.  A simple cone on the ground would have sufficed to keep voters with vision disabilities safe.

14.    The vast majority of polling place barriers could be eliminated with little or no cost to the city.  Providing resources like cones, signs, and training for poll workers would dramatically increase access for many New York voters.

15.    For years, disability advocacy organizations have attempted to work with the City to rectify this problem.  Despite these sustained efforts access barriers persist throughout New York City elections.

16.    Cumulatively, the pervasive individual barriers at New York City polling places work to silence the political voice of people with disabilities.  People with disabilities who know they are likely to face arduous trekking through unfamiliar buildings, indifference from untrained poll workers, or humiliating moments while asking to be accommodated, are either discouraged from going to the polling place or are actively prevented from casting a vote.

17.    Voting is a fundamental American ritual which binds our country.  By preventing people with disabilities from participating in elections Defendants keep this group of people invisible, and limit their ability to participate in the political life of their communities.

18.    On an individual level people who are prevented from voting experience alienation and are treated by their government as if they are not important and not welcome.

19.    For people with disabilities, access barriers perpetuate the isolation which has been a damaging historical reality for this group.

4

20.     The current administration of elections in New York City undercuts the most fundamental goals of the Americans with Disabilities Act – access, independence, and participation in American life.  This lawsuit seeks to compel Defendants to take action to give people with disabilities in New York City the voice, and visibility that they deserve.

## JURISDICTION

21.     This is an action for declaratory and injunctive relief brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

22.     This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

23.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District in which this Complaint is filed, because Defendants are located within this District, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and a substantial part of the property that is the subject of this action is situated in this District.

## PARTIES

24.     Plaintiff United Spinal Association ("United Spinal") is a nonprofit disability rights and veterans service organization. The organization has national membership and was founded in 1946.

25.     The mission of United Spinal is to provide expertise, create access to resources, and strengthen hope, thereby enabling people with spinal cord injuries and disorders to fulfill their potential as active members of their communities.

5

26.     United Spinal drafted significant portions of the ADA.  It continues to advocate for the rights of people with disabilities through state and federal legislation, the courts, grass-roots advocacy, and education.

27.     Almost 1,000 members of United Spinal reside in New York City.  Many such members are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling place in New York City.

28.     United Spinal currently expends substantial time and resources on advocacy work concerning policies and practices that affect disabled voters in New York City.

29.     United Spinal itself has been injured as a direct result of Defendants' failure to ensure that polling places in New York City are accessible to voters with disabilities.  United Spinal's interests are adversely affected because it must expend resources advocating for constituents who are harmed by policies and practices resulting in polling place inaccessibility in New York City.  This injury would be directly redressed by injunctive and declaratory relief in this case.

30.     Plaintiff Disabled in Action ("DIA"), founded in 1970, is a nonprofit civil rights membership organization committed to ending discrimination against people with all disabilities.

31.     DIA consists primarily of, and is directed by, people with disabilities.

32.     Among the goals of DIA is to work for passage of laws that affirm and defend the rights of people with disabilities, including the State Polling Access Law of 1980 mandating that all polling places in New York State be accessible by 1990.

6

33.   DIA's members include residents throughout New York City.  Many such members are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling place in New York City.

34.   DIA currently expends substantial time and resources on advocacy work concerning policies and practices that affect disabled voters in New York City.

35.   DIA itself has been injured as a direct result of Defendants' failure to ensure that polling places in New York City are accessible to voters with disabilities.  DIA's interests are adversely affected because it must expend resources advocating for its constituents who are harmed by encountering barriers at polling places.  Such injury would be directly redressed by injunctive and declaratory relief in this case.

36.   Defendant Board of Elections in the City of New York ("BOE-NYC") is an administrative body of ten Commissioners, two from each borough appointed by the City Council, for a term of four years.

37.   BOE-NYC is responsible for, among other things, selecting and operating polling places for each election district in New York City.

38.   In addition, BOE-NYC's obligations include voter education, notification, and dissemination of election information.

39.   BOE-NYC also recruits, trains, and assigns the various individuals to conduct elections in all the polling places in New York City.

40.   Defendant Julie Dent, in her official capacity, is President of BOE-NYC and is thus responsible for, and a participant in, the actions and omissions of BOE-NYC.

## FACTUAL ALLEGATIONS

7

41.     Defendants select and operate polling places, and select and train poll workers, in a manner that discriminates against registered voters with disabilities, by denying them the right to vote on election day at their designated polling places, and denying them meaningful access to the entire election program operated by Defendants.

42.     For every election, Defendants are responsible for designating a polling place for each district within New York City.  NY Elec. § 4-104(a).

43.     Under applicable state law, each such polling place "shall have at least one entrance that provides access, by ramp or otherwise, to physically disabled voters," unless BOE-NYC specifies in writing why it has determined that it is unable to comply with this requirement.  NY Elec. § 4-104(1-a).

44.     In addition, Defendants have known for decades that federal law requires them to ensure that voters with mobility and vision disabilities are able to physically access their designated polling places on Election Day.

45.     Despite knowledge of these legal requirements, Defendants continue to choose polling place locations that are inaccessible to voters with mobility and vision disabilities.

46.     The Center for Independence of the Disabled, New York ("CIDNY") is the downstate contractor for the Protection and Advocacy for Voter Access ("PAVA") program. This program is operated by the New York State Commission on Quality of Care's Advocacy Services Bureau.  As a PAVA agency, CIDNY helps voters with disabilities register to vote, access polling places, learn more about their rights as voters, and understand new voting laws.  CIDNY's PAVA program serves people in all five boroughs of New York City.

8

47.     Since 2003, CIDNY has inspected polling places in New York City during primary and general elections to determine whether people with disabilities can access the sites and vote without barriers.

48.     CIDNY's inspections show that approximately 70 percent of the polling places in New York City that the BOE-NYC deemed accessible, in fact presented one or more significant access barriers.

49.     Most of the New York City polling places CIDNY inspected during the General Elections on November 4, 2008 and November 3, 2009 had accessibility barriers.

50.     Such barriers included obstacles at entrances, missing or incorrect exterior signs indicating the location of accessible entrances and of the voting area, missing or incorrect interior signs indicating the location of accessible entrances and of the voting area, missing ramps or ramps that did not comply with applicable standards, and accessibility barriers inside polling places.

51.     Barriers at the entrance often include temporary obstructions such as garbage, boxes, tables, or other obstacles that easily could be moved to create a safe path of travel for voters in wheelchairs and voters with visual disabilities. Such voters usually are unable to move these barriers themselves, and typically no poll worker is present to receive a report of the problem so that it can be corrected.

52.     At many polling places, the main entrance to the building is not an accessible entrance. In such cases, Defendants are obligated to provide signs directing voters to the location of an accessible entrance. When an entrance is accessible to voters with disabilities, Defendants also have an obligation to provide a sign at that entrance including the universal symbol for accessibility.

9

53.     Such signs are often missing or inaccurate, however. For instance, when the main entrance to a polling place is not an accessible entrance, Defendants often fail to post any sign near the main entrance indicating where the accessible entrance is located. Disabled voters thus must travel around the building hoping to find some entrance they might use to access their polling place.

54.     Even if a sign at the main entrance does indicate the direction of an accessible entrance, that accessible entrance itself may lack any sign that it is accessible. A disabled voter thus may not realize a particular entrance is the accessible entrance, or in the alternative, must attempt to enter other entrances of the building, hoping for an alternate route inside.

55.     At some polling places, voters using wheelchairs for mobility must use a ramp to access the entrance. Yet in many cases, applicable standards deem these ramps too steep to be used safely. Many also lack level landings at the top by the door that allow wheelchair users to maneuver safely and open the door without risking rolling back down the ramp. Some also lack edge protections that prevent people in wheelchairs from falling off the ramps, and many additionally lack guardrails or handrails which are required by law.

56.     Obstacles inside polling places also preclude access for some voters with disabilities. Even if a disabled voter manages to enter his or her polling place, items placed in the path of travel to the voting area, overhanging obstructions or protruding objects, and impassibly narrow doorways or hallways all can present barriers and/or dangers to people with disabilities trying to cast a ballot.

10

57.     Frequently a building in which an accessible polling place ordinarily is located will be under construction or have some other condition that makes it inaccessible on the day of an election.

58.     Defendants' efforts to ascertain whether the polling places they designate will be and actually are accessible on Election Day are inadequate. Thus, if construction or a temporary malfunction at a polling place, for example, renders it temporarily inaccessible, voters have no way of knowing in advance that they will be unable to access their polling places on Election Day.

59.     Mr. Robert Kraus, for example, is a wheelchair user whose assigned polling place is on the second floor of a building.

60.     To get to the second story, where voting takes place, Mr. Kraus uses an elevator. Mr. Kraus has voted for approximately 40 years and voting alongside his neighbors in his community is meaningful for him.

61.     On a recent Election Day, the elevator he normally uses was not working. From his regular entrance, there was no way to get upstairs besides the elevator. Mr. Kraus successfully found another entrance to the building. That entrance, however, was not wheelchair accessible because there were multiple steps with no ramp, which blocked his way. That day, Mr. Kraus could not access his polling place and could not vote with his neighbors.

62.     Mr. Kraus, like most voters, took time out of his daily life to vote, time which was ultimately wasted when he could not enter the polling site. Mr. Kraus received no advanced warning that his polling place was not accessible and he received no advanced notice directing him to an accessible site.

11

63.     Ultimately, Mr. Kraus' only option for casting a vote was to stay on the sidewalk and to fill out a paper ballot outside, in public, with a poll worker and pedestrians watching.

64.     Because the ballot receptacle was inside the polling place, Mr. Kraus was unable to independently cast his ballot.  Unlike non-disabled voters at this polling place, Mr. Kraus had no way to confirm that his vote was cast at all.  The poll worker who watched him vote confirmed that indeed, Mr. Kraus would have no way of knowing whether his ballot was counted.

65.     Alternatives to voting in person at Plaintiffs' designated polling places like the sidewalk ballot described above, are not lawful or viable substitutes for casting a ballot at the neighborhood polling place.  A disabled voter who arrives at an inaccessible polling place on Election Day may be unable to locate or travel to an accessible voting location before polls close.  When voters with disabilities leave home to cast their vote, they are not assured that their location, or alternative locations, will be accessible.  Faced with the prospect of finding themselves at an inaccessible polling place, many voters with disabilities are likely dissuaded from attempting to vote at all.

66.     Defendants have done no comprehensive analysis of the accessibility of existing polling places.  Thus, it is unclear whether there are even sufficient accessible locations to provide plausible alternative options for disabled voters.

67.     Absentee ballots are a wholly inadequate substitute for voting in person.  For absentee voters to have their votes counted, they may have to vote well in advance of Election Day, which deprives these voters of time to consider their choice which would otherwise be available.

12

68.     Even if absentee were an acceptable substitute, NY Elec. § 8-400(3)(c)(iii)

requires that voters intending to vote by absentee ballot obtain a statement from their doctor

certifying that voting by absentee ballot is medically necessary.   Requiring statements to this

effect is arduous and impractical, and as such, it is not likely that many voters with

disabilities would avail themselves of this already inadequate substitute for an in person

ballot.

69.     Defendants also fail to adequately train poll workers to recognize situations in

trained to handle accessibility issues that do arise.   Those workers are consequently ill-

equipped to deal with the ramifications of a malfunctioning elevator and are unprepared for

how to accommodate a voter in wheelchair who faces an entrance with stairs and no ramp.

70.     Jack Bogart's experience illustrates the gravity of this problem. Mr. Bogart is

a New York City resident who has a disability affecting his mobility.   Mr. Bogart confronted

a similar problem in a recent election.

71.     Mr. Bogart uses a scooter to travel around his neighborhood and to his polling

place to vote.

72.     Defendant BOE-NYC designated a centrally located neighborhood church as

Mr. Bogart's polling place. The entrance to the church has several steps in front of it. There

is no permanent ramp to allow access to this site.

73.     When Mr. Bogart arrived to vote in a recent election, he discovered that

Defendants failed to deliver a temporary ramp to the site.   Such a ramp was absolutely

necessary for voters with mobility disabilities to safely enter this polling place.

13

74. Mr. Bogart sought help from the poll workers that Defendants assigned to this site. He found that they were indifferent to his plight and failed to offer him any help whatsoever. Members of the church stepped in and attempted to improvise a ramp for Mr. Bogart in order to enable him to enter the polling site and vote.

75. The church members found a piece of wood, which they placed over the stairs as a make-shift ramp. The wood was thin and fragile. It could not support Mr. Bogart in his scooter and it crumbled under the weight.

76. As a last resort, the church members physically pushed Mr. Bogart and his scooter up the stairs and through the entrance.

77. After Mr. Bogart voted, he faced the daunting task of exiting the inaccessible polling place. Members of the church again stepped in to help. This time, they placed the top of a dining table over the stairs. The table-top ramp was steep and not safe to use. However, Mr. Bogart felt he had no other option but to try the improvised table-top ramp with volunteers helping him on the way down.

78. During this scene, poll workers called the BOE-NYC to request a safe and usable temporary ramp. Around 9:00 PM Mr. Bogart checked back at the polling place to see if any action had been taken. At that time, when polls were about to close, the location was still inaccessible.

79. Even when temporary ramps are delivered, Defendants do not monitor or spot check polling places to ensure that they are in fact accessible on Election Day. In the absence of such monitoring, Defendants are entirely unaware that polling places are inaccessible unless someone, such as a community organization or an individual voter, alerts them of a problem.

14

80.     Indeed, for many years, CIDNY and individual voters have provided Defendants with abundant information about the prevalence and variety of accessibility barriers in the polling places Defendants choose.

81.     Year after year, Defendants consistently received reports, information, and survey results that demonstrate polling places that are inaccessible. Defendants are also aware of public testimony and advocacy efforts which asked Defendants to take steps to eliminate access barriers. In the face of this evidence Defendants continue to erroneously claim that virtually all of their polling places are completely accessible to all voters with disabilities. Accordingly, they have taken no action to adequately address and eliminate these barriers.

82.     Defendants' selection and operation of polling places in New York City discriminates against registered voters with disabilities. Although in some cases Defendants have made modifications, they have failed to adopt systemic policies and procedures sufficient to ensure that all polling places are accessible on Election Day to voters with mobility and/or visual disabilities.

83.     Plaintiffs are without a plain, speedy, or adequate remedy at law, thereby rendering injunctive relief appropriate in that:

a.   Damages cannot adequately compensate Plaintiffs and their class for the injuries suffered;

b.   If the conduct complained of is not enjoined, a multiplicity of suits will result because Defendants' conduct is continuous and ongoing; and

c.   Damages for the harm inflicted upon Plaintiffs and their class are difficult to ascertain.

15

## CLASS ALLEGATIONS

84.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the named

Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf

of their members, and on behalf of all persons similarly situated.  The class the named

Plaintiffs seek to represent consists of all residents of New York City who are registered to

vote, have one or more disabilities affecting their mobility and/or vision, and are being

denied access to polling places during General Elections and Primary Elections (and any

Special Elections) because of Defendants' failure to ensure that all polling places are

accessible to voters with disabilities on the day of the election.  The class claims asserted

herein are solely for injunctive and declaratory relief for the class.

85.     The persons in the class are so numerous that joinder of such persons is

impractical and the disposition of their claims in a class action is a benefit to the parties and

to the Court.

86.     Data from the United States Census conducted in 2000 indicate that more than

1.6 million residents over the age of 21 in New York City self-identify as having a disability.

Such data further show that more than 220,000 non-institutionalized New York City

residents over the age of 16 have a sensory disability, which includes visual disabilities, and

more than 588,000 non-institutionalized New York City residents over the age of 16 have a

physical disability, which includes mobility disabilities.  In light of such data, a conservative

estimate of the number of registered voters residing in New York City who have a mobility

and/or visual disability is well over 100,000.

87.     There is a well-defined community of interest in the questions of law and fact

involved affecting the parties to be represented, in that Plaintiffs' members have been and

16

continue to be denied their right to vote at their designated polling places on Election Day,

due to Defendants' discriminatory selection of and operation of polling places in New York

City and failure to provide Plaintiffs' members with meaningful access to the voting program

in that City.

88.    Common questions of law and fact predominate, including questions raised by

Plaintiffs' allegations that Defendants have failed to provide accessible polling places on

Election Day for voters with disabilities and have failed to provide program access to New

York City's voting program, services, and facilities, and that Defendants' approach to

physical accessibility of polling places on Election Day excludes and discriminates against

voters with disabilities.

89.    The claims of the named Plaintiffs, or their members, are typical of the claims

of the class as a whole, because the named Plaintiffs, or their members, are similarly affected

by Defendants' failure to provide access to polling places.  For instance, Plaintiffs' members

find it difficult or impossible to enter their polling places and cast ballots there, and the

failure to adequately train poll workers and monitor accessibility of polling places increases

the likelihood that Plaintiffs' members will encounter barriers at their polling places that will

preclude their ability to vote there.

90.    The named Plaintiffs are adequate class representatives because they, and/or

their members, are directly affected by Defendants' discriminatory selection and operation of

polling places, failure to adequately train poll workers, and failure to monitor polling places,

which denies class members meaningful access to polling places in order to exercise their

fundamental right to vote.  The interests of the named Plaintiffs are not antagonistic to, or in

conflict with, the interests of the class as a whole.  The attorneys representing the class are

experienced in disability law and in class action institutional reform litigation. Plaintiffs'

counsel are qualified to fully prosecute this litigation and possess adequate resources to see

this matter through to resolution.

91.     Defendants have acted and/or failed to act on grounds generally applicable to

the class as a whole, thereby making appropriate final declaratory and injunctive relief with

respect to the class as a whole.

## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

92.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of

the Complaint.

93.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132,

provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity."

94.     The term "disability" includes persons with physical and mental impairments

that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Plaintiffs'

members are, or Plaintiffs represent, qualified individuals with disabilities within the

meaning of 42 U.S.C. § 12102, 42 U.S.C. § 12131, and 28 C.F.R. § 35.104. Thus, Plaintiffs'

members and the putative class have mobility and/or visual disabilities that substantially limit

the major life activities of walking, seeing, and/or moving about in their communities

without aids such as wheelchairs, canes, service dogs, and/or similar assistance.

95.     A "public entity" includes state and local governments, their agencies, and

their instrumentalities. 42 U.S.C. § 12131(1). Defendants qualify as public entities within

the meaning of 42 U.S.C. § 12132 and 28 C.F.R. § 35.104.

18

96.     Title II of the ADA generally requires that public entities operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 35.150.

97.     Because of Defendants' failure to ensure, in advance of elections, that the polling places they designate are free from accessibility barriers; failure to train poll workers to recognize and eliminate such barriers; failure to train poll workers to recognize and meet the needs of voters with disabilities; and failure to monitor polling places on Election Day to ensure they are free from accessibility barriers, Defendants do not operate their services, programs, or activities of elections and voting so that they are readily accessible to and usable by individuals with disabilities, such as Plaintiffs' members.

98.     Defendants, "in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, on the basis of handicap – [¶] Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; [¶] Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [¶] Provide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; [¶] Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons than is provided to others unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others; [¶] . . . or [¶] Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege,

19

advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R.
§ 39.110(b)(1).

99.   Defendants' actions and inactions deny Plaintiffs' members, by reason of their
disability, their right to meaningful access to the programs, services, or activities offered by
Defendants; deny Plaintiffs' members the opportunity to participate in or benefit from such
benefits or services; provide Plaintiffs' members with benefits or services that are not as
effective in affording equal opportunity to obtain the same result, to gain the same benefit, or
to reach the same level of achievement as that provided to others; provide different or
separate aid, benefits, or services to Plaintiffs' members than is provided to others; otherwise
limit Plaintiffs' members in the enjoyment of rights, privileges, advantages, or opportunities
enjoyed by others receiving the benefits or services.

100.   The ADA regulations also provide that Defendants "may not, in determining
the site or location of a facility, make selections the purpose or effect of which would (i)
Exclude handicapped persons from, deny them the benefits of, or otherwise subject them to
discrimination under any program or activity conducted by the agency; or (ii) Defeat or
substantially impair the accomplishment of the objectives of a program or activity with
respect to handicapped persons." 28 C.F.R. § 39.110(b)(4).

101.   Defendants determine the site or location of polling places and make
selections regarding polling places, the purpose or effect of which excludes Plaintiffs'
members from, denies them the benefits of, or otherwise subjects them to discrimination
under the election and voting programs or activities conducted by Defendants, and defeats or
substantially impairs the accomplishment of the objectives of such programs or activities
with respect to Plaintiffs' members.

RECEIVED 07-27-'10 10:31   FROM-                    TO-   Disability Rights   P0020/0024

102.    Furthermore, Defendants must "provide signage at all inaccessible entrances to each of its facilities, directing users to an accessible entrance or to a location at which they can obtain information about accessible facilities. The international symbol for accessibility shall be used at each accessible entrance of a facility." 28 C.F.R. § 35.163(b).

103.    Defendants fail to provide signage at all of the inaccessible and accessible entrances to the polling places they select that either directs Plaintiffs' members to accessible entrances or includes the international symbol for accessibility at accessible entrances.

104.    Title II of the ADA requires Defendants to make reasonable modifications in the election and voting program to avoid discrimination against Plaintiffs' members on the basis of disability. 28 C.F.R. § 35.130(b)(7). Defendants' failure to make reasonable modifications in their selection and operation of polling places during elections discriminates against Plaintiffs' members on the basis of disability by making it impossible or more difficult for them to enter such polling places to vote.

105.    Defendants' design and administration of their election and voting program, and in particular their selection and operation of polling places, also tend to exclude individuals with disabilities from that program in violation of 28 C.F.R. § 35.130(b)(8).

106.    By selecting and operating polling places for use during elections in a manner that fails to ensure that they are accessible to voters with disabilities, Defendants use criteria or methods of administration that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the election and voting program in New York City with respect to persons with disabilities, and discriminating against such persons in violation of Title II of the ADA.

21

107.   Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA, persisting for each election conducted in New York City. Unless restrained from doing so, Defendants will continue to violate the ADA. Unless enjoined, said conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

108.   Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

109.   Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

110.   An "individual with a disability" is defined under the statute, in pertinent part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). Plaintiffs' members include, or Plaintiffs represent, qualified individuals with disabilities within the meaning of the applicable statutes.

111.   Defendants' program or activity of conducting elections and voting, including selecting and operating polling places, and selecting and training poll workers, has received substantial federal financial assistance at all relevant times.

112.   The actions and/or inactions of Defendants as alleged herein discriminate against Plaintiffs' members because of their disabilities by excluding them from voting at their designated polling places, causing them to face and overcome physical obstacles not

22

faced by voters without disabilities in order to vote at their polling places, and defeating or substantially impairing the accomplishment of the program and activity of enabling all eligible voters to cast their ballots in elections at the polling places designated by Defendants.

113.    Plaintiffs have no adequate remedy at law, and unless the relief requested herein is granted, Plaintiffs and their members will suffer irreparable harm in that they will continue to be discriminated against and denied access to the programs, services, and activities operated and overseen by Defendants.

## THIRD CAUSE OF ACTION
## DECLARATORY RELIEF

114.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

115.    Plaintiffs contend that Defendants' selection and operation of polling places for elections in New York City fail to comply with applicable laws including the ADA and Section 504, which require public entities to provide meaningful access to programs, activities, and facilities for persons with disabilities.  Defendants disagree with Plaintiffs' contention.

116.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties, and act accordingly.

117.    WHEREFORE, Plaintiffs request relief as set forth below.

## RELIEF REQUESTED

Plaintiffs pray for judgment as follows:

1.    A declaration that Defendants' selection and operation of polling places for elections in New York City discriminates against persons with disabilities and fails to provide meaningful access for persons with disabilities as required by law;

23

2.    An order enjoining Defendant from violating federal discrimination laws in their selection and operation of polling places for elections in New York City;

3.    An award of Plaintiffs' reasonable attorneys' fees and costs; and

4.    Such other and further relief as the Court deems just and proper.


Dated: New York, NY
      July 26, 2010

By:    _____

JULIA PINOVER (JMP333)
Disability Rights Advocates
745 Fifth Avenue, Suite 1515
New York, NY  10151
Telephone:    (212) 644-8644
Facsimile:    (212) 644-8636
Email:         general@dralelgal.org


SID WOLINSKY (CA Bar No. 33716)*
RONALD ELSBERRY (CA Bar No. 130880)*
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, CA  94704
Telephone:    (510) 665-8644
Facsimile:    (510) 665-8511
TTY:          (510) 665-8716
Email:         general@dralegal.org

*Motions for admission *pro hac vice* pending

Attorneys for Plaintiffs