C8RPUNI1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED SPINAL ASSOCIATION, a nonprofit organization, DISABLED
 3   IN ACTION, a nonprofit organization,

 4                    Plaintiffs,

 5          v.                              10 CV 5653 (DAB)

 6   BOARD OF ELECTIONS IN THE CITY
     OF NEW YORK and JULIA DENT, in
 7   her official capacity as
     President of the Board of
 8   Elections in the City of New
     York,
 9
                     Defendants.
10   ------------------------------x
                                        New York, N.Y.
11                                      August 27, 2012
                                        11:19 a.m.
12
     Before:
13                    HON. DEBORAH A. BATTS,

14                                      District Judge

15                       APPEARANCES

16   DISABILITY RIGHTS ADVOCATES
          Attorneys for Plaintiffs
17   JULIA M. PINOVER, ESQ.
     STUART J. SEABORN, ESQ.
18           AND
     CUTI HECKER WANG, LLP
19        Attorneys for Plaintiffs
     MARIANN MEIER WANG, ESQ.
20
     NEW YORK CITY LAW DEPARTMENT, OFFICES OF THE CORPORATION
21   COUNSEL
          Attorneys for Defendants
22   STEPHEN E. KITZINGER, ESQ.
             AND
23   BOARD OF ELECTIONS
          Attorney for Defendants
24   STEVEN RICHMAN, ESQ., General Counsel
     RAFAEL SAVINO, ESQ.
25
```

C8RPUNI1

```
 1                (In open court)

 2                (Case called)

 3           THE COURT:  Good morning.  Please be seated.  United

 4    Spinal Association versus the Board of Elections and Julia

 5    Dent.  On behalf of the plaintiff, we have Miss Pinover.  Good

 6    morning.

 7           MS. PINOVER:  Good morning, your Honor.

 8           THE COURT:  Mr. Seaborn.

 9           MR. SEABORN:  Good morning, your Honor.

10           THE COURT:  Good morning.  And Miss Wang --

11           MS. WANG:  Good morning, your Honor.

12           THE COURT:  -- as well.  On behalf of the defendant,

13    we have Mr. Kitzinger.

14           MR. KITZINGER:  Good morning, your Honor.

15           THE COURT:  Good morning, Mr. Kitzinger.  Mr. Steven

16    Richman.

17           MR. RICHMAN:  Good morning, your Honor.

18           THE COURT:  Good morning.  And Mr. Rafael Savino.

19           MR. SAVINO:  Good morning.

20           THE COURT:  Good morning.  How was your vacation,

21    Mr. Kitzinger?

22           MR. KITZINGER:  Unfortunately, interrupted.  I'm --

23    Actually, I'm only here today in the city because of this

24    hearing, but so far it's been good, and I hope it continues to

25    be good.
```

C8RPUNI1

1          THE COURT:  Well, I'm pleased to hear that you have

2     the ability to go back to your vacation, and I'm sorry that it

3     had to be interrupted, but I think this is a very good reason

4     to interrupt it.  Have you had a chance to talk with

5     plaintiffs?

6          MR. KITZINGER:  We did speak.  We got your order on

7     the 15th.  I believe I e-mailed Miss Pinover and Mr. Seaborn on

8     the afternoon of the 15th.  We spoke on the -- to set up a time

9     to speak.  We spoke on the 16th.  I spoke with Mr. Seaborn on

10    the afternoon or evening of the 16th, evening our time,

11    afternoon Mr. Seaborn's time in California.

12         He told me -- gave me the background sketch of their

13    expected proposal, which they reduced to writing and sent to me

14    on the 17th, when I was already away on my vacation.  And they

15    sent that to you on the 23rd.  For obvious reasons, I didn't

16    respond to their written proposal because I was away.

17          I did forward it to my client.  They had a chance to

18    review it.  I had spoken with my client on a couple of

19    occasions prior to even receiving your Honor's order, saying

20    the parties needed to meet in order to schedule -- to discuss

21    possible proposed remedies, and we have some initial ideas and

22    things that the Board is intending to implement for the

23    September primary.  And we're hoping to further refine and

24    develop a more complete remedial plans for the November general

25    election, but given the time constraints, your Honor entered

C8RPUNI1

1    the decision on the 8th of August.

2              We were in litigation in New York, in Bronx Supreme

3    Court on election matters in the First Department, and up to

4    the Court of Appeals where, unfortunately, the Court denied

5    leave on appeal.  So we didn't have to reprint ballots or

6    change the ballots, or reprint them.  But the Board is

7    furiously working to get the election ready to go two weeks

8    from Thursday.

9              Because right now, they're preparing to test all the

10   ballots and the machines to make sure the machines all function

11   properly and then get them sealed up, inspected -- available

12   for inspection, inspected, sealed and delivered to the poll

13   sites in time for the September 13th primary.

14             They have taken some additional steps including, for

15   the first time, the Board is assigning poll sites coordinators

16   to each poll site, even poll sites which only have a single

17   assembly district at them -- I mean election district contained

18   therein, which is a change in policy and practice from past

19   years.

20             That coordinator is to be instructed to walk the site

21   periodically to check for obstruction, missing signs, so on and

22   so forth.  Normally it is done, but it's actually formalized

23   and scrutinized, and I believe pages are being added to

24   coordinator's journals to record these essentially walk-through

25   inspections.

C8RPUNI1

1          The Board is still reinspecting, resurveying every

2     poll site in the City of New York.  They are moving toward the

3     goal of completing that, according to State law.  I think it's

4     December 15th they have to resurvey all 1,400 poll sites and

5     replace those that are found to be not fully accessible.

6          I believe one of the poll sites is a barrier-free

7     living residence that was inspected and found to be

8     noncompliant, and we've notified that residence that they're

9     missing a handrail on a ramp.  We're hopeful that that will be

10    rectified, and we'll be able to continue using that poll site

11    because barrier-free residences tend to serve as good poll

12    sites because, among others, those who live there are more

13    easily able to vote.

14          For the first time also for this election,

15    coordinators will be provided with additional signage at the

16    poll sites, more than is actually formally and specifically

17    needed.  So, for example, if it's a windy day and signs blow

18    away or they're stolen, they should have replacement signs

19    available.

20          The Board of Elections also ordered new directional

21    arrows.  The typical ones say "vote here" in one, two, three,

22    or four languages.  They now added a fifth language, which is

23    Bengali.  So now we have Bengali, Korean, Chinese, Spanish and

24    English in various poll sites.  Spanish and English everywhere.

25    Chinese in parts of Brooklyn and Manhattan and Queens, Korean

C8RPUNI1

1    in parts of Queens, and Bengali in parts of Queens.

2              They've now ordered additional signs that are in blue

3    with the universal access sign.  So instead of having just a

4    simple "vote here" arrow towards the main entrance, where the

5    accessible entrance is different, there will also be the

6    accessible arrows pointing directly to that accessible

7    entrance.

8              THE COURT:  Let me just ask you on that,

9    Mr. Kitzinger.  If the accessible entrance is not visible from

10   the main entrance, how will the individual at the main entrance

11   know where to go to get to the accessible entrance?

12             MR. KITZINGER:  Well, that's what I'm saying.  In

13   addition to the traditional "vote here" signs, the arrows, new

14   signs have been ordered.  New signs have been ordered that say

15   "vote here" with the universal accessibility symbol printed on

16   it and with arrows, additional arrow signs in the accessible

17   blue with the universal sign of accessibility on it.

18             THE COURT:  So it's pointing them to the path to get

19   to the accessible entrance?

20             MR. KITZINGER:  Yes.  Where it's different, it will

21   follow the path to the accessible entrance presumably from --

22   hopefully, from the main entrance, where it's different.  So if

23   someone were to come up to, say, the courthouse and come up to

24   the Pearl Street entrance, you would have the accessibility

25   arrows pointing from there to the Worth Street entrance and

C8RPUNI1

1     following that path.

2             THE COURT:  And then when you get to the Worth Street

3     entrance, would there be a sign that says also this is the

4     accessible entrance?

5             MR. KITZINGER:  Yes, that's standard.  That's always

6     been there.

7             THE COURT:  Okay.

8             MR. KITZINGER:  When it hasn't been removed or blown

9     away or tampered with.

10            THE COURT:  What are they made out of?

11            MR. KITZINGER:  I think it's a heavy duty paper.  I

12    don't know if these are laminated or not.  This was a volume

13    job on short notice.  They're heavy stock paper.  I think the

14    Board is trying to move, at least at sometime, to a laminated

15    sign.

16            THE COURT:  That would be good.  Then we don't have to

17    worry about the weather.  You know what, Mr. Kitzinger, you are

18    a master at doing simultaneous translation.  I see that

19    Mr. Richman is constantly talking to you and you are,

20    nevertheless, not stopping at all and giving it all to me.

21    Would it be easier for Mr. Richman to have an opportunity to

22    talk, and then I will get back to you, Mr. Kitzinger?

23            MR. KITZINGER:  Sure.  I mean, Mr. Richman was not on

24    vacation last week and has had more direct, face-to-face

25    contact with -- I mean, he's general counsel at the Board of

C8RPUNI1

1   Elections and had more direct and recent communications with

2   the principals at the Board.

3           MR. RICHMAN:  Your Honor, at those sites that are in

4   public buildings, we've installed sleeves in which now a

5   plastic hard sign gets inserted to show that this is the

6   accessible entrance.  Usually if there is no other devices, we

7   now have installed in each of those locations to put a bell to

8   ring so it will ring inside to let the door clerk know to open

9   the door, as well.

10          THE COURT:  Yeah, but that doesn't always work.

11  Either the bell doesn't work or the person inside is not there.

12  I mean, that does have its issues, I understand.

13          MR. RICHMAN:  Again, what we've tried to do is by

14  having them be battery operated, they are not installed and

15  delivered to the custodian supposedly it's to be limited to the

16  night before the election.  So hopefully -- The battery is

17  supposed to be a 48-hour battery.  We only have to be open 16

18  hours.  We hope that will work.  But, yes, your Honor, there

19  are occasional mistakes like that.

20          But, again, trying to deal with the idea of having

21  signs blown away or taken off, by putting them in a sleeve,

22  it's been a much better location.

23          I think by including the directional arrow, it will be

24  clearer to the voter who comes up who did not read to the

25  notice that goes to vote.  The notice went out August 1st

C8RPUNI1

```
 1    through 5th.  If there's an accessible entrance that's
 2    different from the main entrance, that's noted on the flyer.
 3    We redesigned the flyer this year so that there's a tear-off.
 4    So you can take off all your new voting information.
 5           Since it was a redistricting year, every voter has
 6    been assigned to a new election district and assembly district,
 7    even if they're in the same poling site.  We've given them
 8    information that they can tear off and, hopefully, the voter
 9    will have read the notice prior to September 13th or
10    November 6th, take the card with them and know how to go in and
11    be able to do that.
12           In addition, when you go onto the new website, on the
13    poll site locator, it says the accessible entrance, there's the
14    alternative, other than the main entrance.  When you put in
15    your address and your poll site appears, that information
16    appears on the display as well.  So hopefully, when the voter
17    gets to the poll site, they know where to go so that, in
18    Mr. Kitzinger's example, if they're being dropped off by
19    Access-a-Ride, they're being dropped off on the Worth Street
20    side, not the Pearl Street side so they don't have to negotiate
21    the distance.  So we're trying to do as much as possible to get
22    information in advance to the voters.
23           In addition, we have also, for those sites that have
24    been deemed inaccessible in accordance with State law, notices
25    went out to those voters advising them that if they wish, they
```

C8RPUNI1

1    could have their registration record transferred for the

2    upcoming primary to a fully accessible site.  As of Friday,

3    before we came here for another proceeding, we had gotten a

4    response of about a couple of dozen and that's all.

5              THE COURT:  Who have been asked to be registered

6    someplace else?

7              MR. RICHMAN:  Not be -- just change their registration

8    record.  We needed that in before last Friday so when we print

9    the registration poll record, that will be included.  So that

10   if this site is deemed to be not fully accessible, and the

11   Civil Court at 111 Centre is, you could have asked for that, if

12   you applied to the Board.  You fill out the form.  It comes

13   back in, your registration record gets transferred to that

14   election.

15             We're hoping, as Mr. Kitzinger said, that by the end

16   of December, we'll complete the surveys, and that for the 2013

17   cycle, every poll site, as required by State law, will be an

18   accessible site.

19             THE COURT:  All right.  Ms. Pinover, would you like to

20   respond, or Mr. Seaborn?

21             MR. SEABORN:  Just a couple of things, your Honor.

22   Mr. Seaborn.  We took your order very seriously.  We pounded

23   the pavement.  We talked to experts.  We talked to CIDNY, who's

24   here in the audience, and who could speak, if necessary.  We

25   haven't seen anything in terms of what defendants are talking

C8RPUNI1

1    about.

2            We put ourselves out there for them.  They're

3    essentially trying to work in a vacuum and reinvent the wheel.

4    The poll site coordinator, that's something we put in our

5    proposal.  Signage, it is an issue, but the folks at CIDNY have

6    ideas about how to fix it and how on-site poll site

7    coordinators can take care of it.

8            They haven't talked to us.  They haven't shared

9    information with us.  Why do they have to reinvent the wheel

10   when CIDNY experts and others have opined already?

11           THE COURT:  Well, I hear what you're saying, but are

12   you responding that what they have proposed is not adequate?

13           MR. SEABORN:  They haven't shown us anything.  This is

14   the first time we've heard about anything with the signage.

15   This is the first time we're hearing about some of these

16   changes to the poll sites.

17           Your order was essentially for us to meet and confer,

18   tell the parties to get together.  There's no need to re-invent

19   the wheel.  CIDNY has done surveys for eight years.  We

20   recognize defendants are doing some surveys.  Why not put

21   everything together?  There's a very short period of time

22   between now and November.

23           CIDNY can train their poll site coordinators.  It

24   sounds like there is going to be a poll site coordinator at

25   each poll site.  Why not work to get -- They've essentially

C8RPUNI1

1    kept us in the dark.  And these are Mr. Richman's proposals.

2    They could have been shared with us earlier.

3         We're now approaching September.  You know, the

4    primary is coming up and the November election is coming up.

5    It's almost a shock to us that we're hearing about these

6    changes.  We haven't heard about them before.

7         THE COURT:  Well, I understand, but what I would like

8    to do is, instead of having a territorial discussion here, now

9    that you hear that they are making and have made some changes,

10   even though you have not had an opportunity to see them, are

11   you suggesting that, as described, it is still unacceptable?

12        MR. SEABORN:  It's minimal.  I mean, the thing with

13   the sleeve and the signage, that's a start.  They're notifying

14   people that they're at an accessible poll site, that's a start.

15   There are many more inaccessible poll sites than the Board

16   actually knows about.  That's something that was in our 56.1

17   statement.  That's something that you commented on in the

18   order.

19        Not all those folks can be notified.  So certain

20   things need to be done that are different than what they're

21   doing.  Why not gather the folks together.  Why not gather the

22   folks at CIDNY that have done surveys for eight years and put

23   their heads together and come up with a solution?  We proposed

24   something.  We'd like CIDNY to train their poll site

25   coordinators for this election.

C8RPUNI1

 1           For the future, it could be some third party.  It
 2     could be CIDNY.  It could be somebody else, as long as that
 3     person has expertise.  But for November, we need to put our
 4     heads together.  There's limited time.  There are incredible
 5     amounts of barriers that have been documented, and I'm not
 6     hearing enough to communicate that something is going to be
 7     done about it.
 8           THE COURT:  Well, it isn't helpful to me, Mr. Seaborn,
 9     to start out with, well, they're not doing what we told them to
10     do and how we want it done, and I don't know what they're
11     talking about.
12           Would it be helpful for you all to have an opportunity
13     to talk to each other and figure out, based on what the Board
14     of Elections says it is prepared to do or is doing, using that
15     as a starting place to see what additional things CIDNY can do
16     to help them to reach even further, either very near term for
17     September 13th or certainly by the general election in
18     November, to maximize the opportunities of individuals who are
19     disabled to vote?  They have ideas.  You have ideas.  Do you
20     think you all should talk?
21           MR. SEABORN:  Absolutely.  We've tried to talk, and
22     we're certainly open to doing so today and any time in the near
23     future before the election.  We actually brought Monica Barkley
24     from CIDNY today.  She can talk about what CIDNY is prepared to
25     do.  I think it's actually a great idea.

C8RPUNI1

1          THE COURT:  I think it's in her affidavit what they

2     are able and willing to do.

3          MR. SEABORN:  Yes.

4          THE COURT:  And I think it is a really, what I call,

5     if you will, Bert-and-Ernie cooperation that the parties are

6     willing to work together.  Certainly, the plaintiff is willing

7     to work with the Board of Elections.

8          Now, I could say to you, since this is the first time

9     you're hearing things and this is the first time I'm hearing

10    things and the Board of Elections has not had an opportunity to

11    reduce this to writing, that it might make sense to have an

12    opportunity to talk.

13         Now, I know, Mr. Kitzinger, you're going away.

14    Mr. Richman, are you willing to take on the responsibility of

15    working with the plaintiffs during Mr. Kitzinger's remaining

16    vacation so that you all can see really how far apart you are

17    before you come back and talk to me?

18         MR. KITZINGER:  Your Honor, I have to strenuously

19    object to that because what -- Mr. Richman is counsel and is

20    very familiar with the board.  I am counsel of record.  Michael

21    Cardozo, Corporation Counsel, is counsel of record and I'm one

22    of his assistants.

23         I am the designated individual, and the Corporation

24    Counsel is designated by city charter to represent -- and only

25    the Corporation Counsel and his or her assistants are

C8RPUNI1

```
 1   authorized to represent the Board of Elections in litigation

 2   matters without a special designation which, unfortunately,

 3   Mr. Richman does not have.

 4            And it would seem inappropriate to have the client

 5   speaking directly with counsel for plaintiffs.  Moreover, it's

 6   the Board's position that, at this point in time, the Court

 7   should enter an order directing no more --

 8            THE COURT:  You're not -- Don't even finish the

 9   sentence.  That's not happening.  Okay?  That is not happening.

10   I should order no more based on the oral representations made

11   to me this morning?  It's not happening.

12            MR. KITZINGER:  Your Honor, what I was going to say,

13   is no more than for the Board to develop and implement a plan,

14   a remedial plan pursuant to Schwartz v. Dolan, and Dean v.

15   Coughlin.  Schwartz v. Dolan is 86 F3d 315 and Dean v. Coughlin

16   is 804 F2d 207, which recognize that there's a federal issue at

17   play here that where a deficient -- constitutional deficiency

18   has been found by the Court, the Court -- and the

19   constitutional deficiency by a state or local government, the

20   Court should order that governmental entity to develop and

21   implement a plan in the first instance, and only when the --

22   that entity fails to do so or presents a plan that is facially

23   infeasible, should the Court go further and implement specific

24   directions.

25            THE COURT:  Well, let me put it to you this way.  If
```

C8RPUNI1

1    we were talking about 2010 or 2011, that would probably be very

2    effective and the way to go.  But we do have somewhat of a time

3    crunch here, and I cannot help but notice that we do have a

4    Presidential election coming up in November.

5             Now, are you telling me that I can't tell you to do

6    anything other than what you want to do in terms of the general

7    election?

8             MR. KITZINGER:  No.  What I'm saying is, I think in

9    the first instance, the order should be to direct the Board to

10   develop a plan to present to the Court, and we are in the

11   process of doing that.  We've been doing that.  I had -- We got

12   your order on the 8th of August.

13            I met with the commissioner of elections the very next

14   meeting, which was on the 14th.  I had additional meetings with

15   the executive committee by telephone and in person.  The

16   executive committee consists of the president --

17            THE COURT:  I don't really care who's on the executive

18   committee right now.  I don't think I need to know that.  What

19   I'm asking you is, what are you saying, that I really can't do

20   anything other than tell you to develop the plan and good bye

21   and hope it works in November?

22            MR. KITZINGER:  No, your Honor.  First of all, to be

23   clear, many of the things that Mr. Richman referred to,

24   including sending out the letters, the voter information

25   notices, identifying the accessible entrance have all been done

C8RPUNI1

1    in the past.

2            THE COURT:  And they have been done in the past, but

3    the problem is, is that there are situations that developed

4    during the day at those poling sites that weren't there

5    necessarily at the beginning of the day, but nevertheless,

6    because people who are disadvantaged, are not told show up to

7    vote only during this 15-minute period that we can guarantee

8    that you'll be able to get in.

9            I mean, they have a right, as everybody else, to be

10   able to go during the poll hours to vote.  You know that things

11   don't always work out, and by the time they're discovered to be

12   a problem, the remedy is not necessarily at hand.  And,

13   therefore, those individuals who are at that poling place don't

14   have the opportunity to vote.

15           Now, I'm not saying you've never done anything.

16   Please don't think I'm saying that, but what I am saying, all

17   of these things are not new to me because they were part of the

18   papers that were submitted to the Court when I ruled on the

19   motion for partial summary judgment.

20           So I understand that there are problems that can

21   develop during the day, which is why having somebody there

22   devoted to, dedicated to dealing with those problems at each

23   poling site with the ability to have things taken care of

24   immediately, for instance, if the bell isn't ringing, to be

25   able to have somebody there to make sure that people can still

1    let it be known that they need to have access.  That is, you

2    know, keep the door open.

3              I mean, you see, there are so many different things

4    that could be a problem.  For instance, there could be a fire

5    hazard in having a door propped open because the bell isn't

6    working.  But there are things that you can't solve unless

7    somebody is there, ready and educated and knowing what to do

8    with that particular problem.  Is that what you're saying

9    you're going to have?

10             MR. KITZINGER:  Yes, the poll site coordinator.

11             THE COURT:  But coordinator means they're doing other

12   things, right?  This isn't the disabled coordinator.  This is a

13   general coordinator?

14             MR. KITZINGER:  This is a person who's in charge of --

15             THE COURT:  No, no.  Answer my question.

16             MR. KITZINGER:  Correct.

17             THE COURT:  Is this someone dedicated only to making

18   sure that the disabled individuals who are coming to that

19   particular site are going to be able to vote?

20             MR. KITZINGER:  No, it is not.

21             THE COURT:  Okay.  That is my point.  That is my

22   problem because this person is charged with doing a whole lot

23   of other things, your coordinators.  I know about the

24   coordinators.  Their jobs are many, are challenging and they

25   have to deal with everything, including machines that don't

C8RPUNI1

 1    work, including a whole lot of other things.  And, therefore,

 2    to add this to their list has not been effective in the past,

 3    and I don't understand why you think it would be now.

 4          MR. KITZINGER:  Well, this is something that is now

 5    explicit, that they have to walk the site periodically.  It's

 6    now pages have been added to the coordinator journal, which

 7    they're supposed to fill out and complete after each election.

 8          THE COURT:  No, no, I understand, and I'm not --

 9          MR. KITZINGER:  Your Honor, very candidly, there's no

10    way that the Board will be able to recruit and train an

11    additional 1,400 individuals or fund an additional 1,400 --

12          THE COURT:  Well, the funding is not my problem.  It

13    is your problem, but the point that you don't have the money

14    isn't a reason for me to say, well, you don't have to do it.

15          MR. KITZINGER:  We couldn't possibly, between now and

16    September 13th or even really November, recruit an additional

17    1,400-plus poll workers to serve as accessibility coordinators

18    at every poll site.

19          THE COURT:  Well, maybe you could get some help doing

20    that.  Maybe the plaintiffs are able to provide you some

21    assistance to help you take care of that so that, working

22    together, we wind up with a situation where we have truly

23    minimized the difficulty of the disabled, disadvantaged to be

24    able to vote.  And, you know, if it's a stop-gap measure,

25    because we're talking about weeks or months as opposed to a

C8RPUNI1

1    permanent fixture, it's a start.

2            MR. KITZINGER:  Your Honor, I would just also

3    reiterate that what I've already referred to are things that

4    the Board is doing and planning to do for the September

5    primary, not even the November general.

6            We are working -- the Board is working diligently to

7    implement new things for the September primary, which is in a

8    little over two weeks, and then to do additional things for --

9    to pilot additional ideas for the general time.

10           THE COURT:  All right.  Then, this is a problem.  You

11   know, you deserve your vacation, Mr. Kitzinger.  I am not

12   suggesting you don't, but the timing of this -- When is your

13   vacation over?

14           MR. KITZINGER:  I am scheduled to return to the office

15   the day after Labor Day.  I'm supposed to be out the remainder

16   of this week.

17           AUDIENCE MEMBER:  That's the 4th.

18           THE COURT:  Well, I must say that I applaud the Board

19   of Elections' efforts to make changes and make improvements as

20   early as the September primary, but I do believe, if I'm not

21   mistaken, that the focus of the plaintiffs this year is really

22   the general election.

23           MR. KITZINGER:  Well, your Honor, but one of the

24   benefits of taking steps now --

25           THE COURT:  No, no.

C8RPUNI1

1              MR. KITZINGER:  -- is we'll see if they work and get

2     an idea and maybe develop additional things, including -- one

3     of the things that the Board is doing is they've purchased, I

4     believe, it's 20 tablet computers with cameras and wireless

5     capability, which will be distributed to the pilot group of AD

6     monitors or executive office monitor teams, and they will be

7     going to the poll sites and videotaping.

8              Their plan is to videotape from the time they get out

9     of the vehicle, into the poll sites, take images of the poll

10    sites itself, setup.  They will be able to do the surveys,

11    their reports right on the tablet computer, send in wirelessly

12    any reporting of any problems.  So you'll get an essentially,

13    hopefully, an immediate dispatch of someone to resolve the

14    problem.  They'll also be --

15             THE COURT:  Let me just stop you right there.  Haven't

16    we been there and done that in the past?  Hasn't there been

17    somebody to report a problem, but then nothing was done about

18    it?

19             MR. KITZINGER:  Your Honor, in the past, problems get

20    called in mostly anonymously and --

21             THE COURT:  What do you mean anonymously?  They don't

22    tell you which poling place the problem is?

23             MR. KITZINGER:  No.  They call in.  There's no way to

24    follow up with the individual who called in the alleged

25    problem.  If your Honor were to go to a poll site and notice

C8RPUNI1

1    something, call it in, you may or may not give your name or --

2            THE COURT:  But what is the purpose of my name?  I

3    don't understand.  Are you saying people are just like pulling

4    a false alarm?

5            MR. KITZINGER:  No.  Because if we get to the site and

6    we don't see the problem, it may be remedied already.  We may

7    not be able to identify what the problem is.  It may not be

8    clear once someone from the Board is there, and it would be

9    easier to follow up to get name and contact information, just

10   get additional information to find out exactly what the problem

11   was.

12           THE COURT:  You mean when somebody calls in, they're

13   not asked these questions?

14           MR. KITZINGER:  They are, but they don't always give

15   the information.

16           THE COURT:  On how many times have people called in

17   and not given that information?

18           MR. KITZINGER:  I don't have the statistics.

19           THE COURT:  That may happen.  If it doesn't happen all

20   the time, then that is -- I mean, I don't understand why you're

21   telling me that sometimes people don't identify themselves as a

22   basis for me to say, well, you don't have to worry about people

23   calling in anonymously.  I don't understand where you're going

24   with this.

25           MR. KITZINGER:  I'm not at all saying that.  What I'm

C8RPUNI1

1   saying is this new program that the Board is piloting, you'll

2   have -- be able to track -- you'll have to check in at the poll

3   site wirelessly just by using a GPS; so you can tell when they

4   arrived, when they leave the poll site.

5           They'll have video of the route into the poll site,

6   into the poll room.  They'll be able to record, and where

7   appropriate, resolve -- mark issues that have been resolved.

8   This will be immediately in a computer system; so it will be

9   more easily traceable and less likely to get lost.

10          Another problem we had --

11          THE COURT:  Wait.  Where are you going with this?  Are

12  you saying this eliminates which problem that I've been talking

13  about?  How many people are going to have these, 20?  How many

14  poling places do we have?

15          MR. KITZINGER:  We have approximately 1,400 poll

16  sites, but your Honor, the reason -- the vendor that is

17  programming it and we're working with, actually only wanted us

18  to use ten in the initial pilot, but we insisted there be 20.

19  And they're trying to roll it out for the November general, and

20  eventually it will be rolled out on a, hopefully, much broader

21  basis to each AD monitoring team so that their reports will

22  then be electronic, will be wirelessly transmitted.  You'll

23  have video.  You'll have the GPS reports that says when --

24          THE COURT:  I think all of that is wonderful.  I am

25  not knocking that in any way, shape or form.  I actually think

C8RPUNI1

  1    that anything that could be of assistance is great, but how

  2    does that deal with the problem at another poll site where

  3    individuals are not able to vote and no one is able to remedy

  4    it?

  5              MR. KITZINGER:  Your Honor, the coordinators are being

  6    instructed now formally to walk the site and report in their

  7    coordinator journals the results of their inspection and to

  8    clear any obstruction.

  9              THE COURT:  But we're going in circles here,

 10    Mr. Kitzinger.  They have a whole lot of things to do, these

 11    coordinators, right?

 12              MR. KITZINGER:  Yes.

 13              THE COURT:  You're not just responsible for this.  If

 14    when somebody leaves, something happens to the accessible

 15    entrance, and they've already made a tour of that area, and it

 16    would include before, but right away there's a problem with it

 17    when they're doing all the other things they have to do,

 18    meanwhile, that accessible entrance is not accessible.  Even

 19    though at the time that they saw it, it was, and, therefore,

 20    they didn't think that there was a problem.  And then they have

 21    to go and take care of their other things.

 22              On the other hand, if there's somebody there, who was

 23    trained and dedicated to making sure that not only is the

 24    accessible entrance truly accessible but that everyone who is

 25    coming in is able to not only enter, vote and leave, and that's

C8RPUNI1

 1    all that they're in charge of, there is a much smaller chance

 2    that there's going to be a problem at that poll site during the

 3    period of time that the voting is going on for anyone who is

 4    disabled.

 5            MR. KITZINGER:  Your Honor, where there's a door clerk

 6    at the accessible entrance, that door clerk is instructed and

 7    trained to take the necessary steps to make sure the entrance

 8    remained accessible at all times, but even if you were --

 9            THE COURT:  There have been instances, I believe,

10    where the door clerk went to the bathroom, where the door clerk

11    didn't show up, where the door clerk was asked to do something

12    else.

13            You're talking about a dedicated door clerk.  You're

14    going to give me a dedicated door clerk, who does nothing but

15    make sure that the doors are open and accessible, but yet, we

16    can't have somebody who has more expanded responsibility?  Once

17    you take that door clerk away from the door, what's going to

18    happen?

19            MR. KITZINGER:  The door clerk is not supposed to

20    leave without having somebody else there.

21            THE COURT:  Yeah, but you know that isn't what

22    happens.

23            MR. KITZINGER:  Your Honor, that's a fundamental -- If

24    you look at what the Board is doing, they're posting 1,400

25    individual events on a single day, using temporary staff and

C8RPUNI1

1    there's -- in locations they neither own, operate nor otherwise

2    control.

3            THE COURT:  Beautifully put in a nutshell.  I know

4    what your problem is.

5            MR. KITZINGER:  And, therefore, yes, there will always

6    be problems and isolated problems, no matter what we do, no

7    matter what the Board --

8            THE COURT:  I guess that the problem I'm having is I'm

9    not so sure they're isolated.  If you're telling me at the last

10   election there were only five to ten instances, I think you'd

11   be perhaps on stronger ground, but I think that there were more

12   than that.

13           MR. KITZINGER:  Your Honor, with regard to the reports

14   to the call center, historically, the Board has not done a good

15   job of closing out the reports once the problem has been

16   remedied.  The absence of a report closure does not necessarily

17   mean it was not resolved.  The board has updated the software

18   and gotten a new call center software, which also includes TTY.

19   I think it's now TTY service, which should also help.

20           But there will always be problems.  That's a fact of

21   life.  The idea and the goal of the Board is to minimize the

22   problems, both in nature and scope and time, because things

23   will always occur.

24           If somebody doesn't -- If a door clerk fails to show

25   at 5:30 in the morning, 5:00 in the morning, when it's time for

C8RPUNI1

1   them to show up, the coordinator is supposed to call in and get

2   someone sent from the standby pool.

3          Now, depending on where that poll site is, it may take

4   a little longer to get there or a little less time to get

5   there, but the Board does and always has maintained a standby

6   pool of poll workers.

7          You're dealing with -- If the Board had its druthers,

8   it could build 1,400 poll sites and maintain them and operate

9   and open them and control them year-round.  That's just not

10  something that's possible.  We're in a city that's very

11  condensed, very high population density, a lot of older

12  facilities.  A lot of people do not want poll sites in their

13  private facilities because they don't want people coming in,

14  basically, at all hours of the day.

15         THE COURT:  Not all hours of the day.  You can't vote

16  all hours of the day.

17         MR. KITZINGER:  Your Honor, the poll sites are

18  officially open from 6:00 a.m. to 9:00 p.m., for 16 hours.  If

19  you're in the poll site at 9:00 p.m. -- at 8:59, you can stay

20  until you vote, which if people show up late, it can run late.

21  We've seen lines all around the country where people show up.

22         Moreover, to set up the poll sites, people start

23  coming from 5:00 in the morning.  They don't always close it

24  down until well into the night because if people are there

25  voting until 9:30 or 10:00, you can't shut down the machines

C8RPUNI1

1  and start closing everything up until the last person has voted

2  and out of the poll site, which the whole voting procedure can

3  take over an hour, easily.

4          So you're really talking from 5:00 a.m. until 11:00 at

5  night.  So you're talking about 18 hours where you're going to

6  have people in your building.

7          THE COURT:  Don't they get paid for it?

8          MR. KITZINGER:  The building operators do not get a

9  huge amount of money, but they have security concerns.  They

10  don't want people in their building.  In the past year, we have

11  had to go into State Supreme Court and sue building operators

12  and owners who were trying to block us from using the properly

13  designated sites.

14          It's getting harder and harder.  Everyone is concerned

15  about terrorism or theft or other problems, and no one seems to

16  have this desire to support democracy that they used to have.

17  The Board uses schools where available, then other public

18  buildings, and then buildings that have tax exemptions or other

19  tax benefits because they have a legal right to use those

20  buildings under the election law.  And but purely private

21  buildings with no tax benefits can simply say no.  Because if a

22  building with a tax benefit blocks the board, the building can

23  sue to have the tax benefit revoked.

24          (Continued on next page)

25

C8RZUNI2

```
1           THE COURT:  Well, aren't there a whole lot of tax
2    deals to encourage people to develop in New York that have been
3    done, so that practically every building in New York that's
4    younger than I am has some sort of those very tax benefits that
5    they could be held responsible for?
6           MR. KITZINGER:  No.  And the other problem is not all
7    the -- a lot of the buildings don't have the space, whether it
8    be in the lobby or community room, to run a poll site.
9           THE COURT:  Okay.
10          MR. KITZINGER:  For a single poll site you need about
11   400 square feet of space.
12          THE COURT:  Okay.
13          MR. KITZINGER:  So it becomes difficult to necessarily
14   locate and identify and secure these sites.  And that is
15   what -- the Board goes out all the time looking for replacement
16   sites.
17          THE COURT:  Okay.  Let me hear from Mr. Seaborn.
18          MR. SEABORN:  So, your Honor, we haven't seen evidence
19   in the record that the Board is actually doing this with the
20   frequency that Mr. Kitzinger is mentioning.  Cities throughout
21   the country, there's a settlement in Philadelphia, we might
22   have referenced it in the letter, it's an older city, as well,
23   identifying alternate access issue poll sites as part of the
24   plan.  We recognize that part of would take a long time and
25   that's why we proposed a five year timeframe.
```

C8RZUNI2

1          But I also wanted to jump back to your comment.  We

2     have an entity think that is trained, has expertise, and has

3     made itself available to do the kinds of things that we're all

4     accepting are difficult, and we certainly view that as a

5     cooperative relationship.  But what we like is some sort of

6     formalization of that cooperation.  We haven't gotten that from

7     the Board so far.  CIDNY could train folks.  They could do

8     outreach to get people to be these on-site coordinators.  We

9     don't have the cooperation or something formal to get it done

10    in terms of having them cooperate with the Board to do so, and

11    that's what we're asking for today.

12          MR. KITZINGER:  Your Honor, with regard to CIDNY, it's

13    very very uncomfortable because they're the on-site PAVA

14    coordinator.  They've been a coordinator, they've had contracts

15    with the Board of Elections, provided training, the very

16    training that plaintiffs now claim is insufficient.

17          Moreover, they're sort of the eminent per se behind

18    this lawsuit on the plaintiff's site.  They provided all the

19    data to plaintiffs.  I didn't get much in response to discovery

20    demand and subpoena for information from CIDNY about

21    communications regarding this litigation.  But to suggest that

22    now, after they've done the Board's training, prepared the

23    materials, trained the trainers, to suggest that they should

24    come in and get paid additional monies --

25          THE COURT:  We're not talking about payment yet.

C8RZUNI2

1          MR. KITZINGER:  Well, plaintiffs made it clear they

2     want CIDNY to be paid, and for a long term contract, it's

3     really, it would seem to be inappropriate at best, since that's

4     the very entity that's been doing the training that plaintiffs

5     complain is wholly insufficient.

6          THE COURT:  Okay, that's an interesting point.

7          Mr. Seaborn, would you like to address that?

8          MR. SEABORN:  Certainly.  We've not claimed that

9     CIDNY's training on its own is insufficient.  What we're

10    alleging is --

11         THE COURT:  Is sufficient or insufficient?

12         MR. SEABORN:  We're not claiming it's insufficient.

13    Their training materials are based on the DOJ poll site

14    accessibility checklist.  They actually prepared a checklist.

15    This is something they prepared about a year ago, but it's

16    something that could easily be revamped for this election.

17    This is an on-site coordinator checklist.  It's a lot easier

18    than the surveyor check list that takes -- that takes a full

19    day's worth of training.

20         But the problem we've had with the Board of Elections

21    and CIDNY's training is not enough folks were trained in a

22    timely way.  It took years for this to happen, and certainly we

23    recognize that in the papers we received in their 56.1

24    statement.  There are folks, I think there were 28 coordinators

25    who were trained by CIDNY.  We think that's a good start.  But

C8RZUNI2

1    it's not something that's happened -- this is something that

2    kind of happened overnight.  We think it's probably happened as

3    a result of litigation.  So we're not -- we have no beef with

4    CIDNY's training whatsoever.

5            In terms of a long-term solution, it doesn't have to

6    be CIDNY.  That's not our client.  We're looking at a November

7    election, and that's the only entity with expertise we can see

8    in the city.

9            MR. KITZINGER:  Your Honor, they do not train any AD

10   monitors or executive office monitor teams.  They train

11   trainers, who then train the 30,000 poll workers.  They did

12   train the surveyors and certify the surveyors, and that was

13   about 25, I believe about 25 surveyors they've trained and

14   certified, but they at no time trained AD monitors or general

15   office monitors.

16           MR. SEABORN:  Your Honor, that's one thing that they

17   maybe they should have done.  Training the trainers -- it's

18   like playing telephone.  You train somebody, that next person

19   might not give everything that person got to the next person.

20   So it's not -- we have no beef at all with the scope or the

21   content of the training.  It's really how many people were

22   trained and how many people they have on-site paying attention

23   to this.

24           MR. KITZINGER:  Your Honor, the Board of Elections

25   trained 36,000 poll workers this year.  I seriously question

C8RZUNI2

1    whether or not CIDNY has the staff to train 36,000 people each

2    year on accessibility issues.  That is why the Board has it set

3    up where CIDNY comes in and trains the trainers and then the

4    trainers go out and train the 30,000 poll workers using the

5    materials developed and prepared by CIDNY.  I mean, the only

6    difference is if CIDNY were to train trainers and then have

7    them come in, or CIDNY prepares trainers the Board hires and

8    those trainers, and the Board had trainers for accessibility

9    issues as well as all of the other election day operation

10   issues.

11            THE COURT:  Do the CIDNY trained BOE trainer

12   individuals then go and train the coordinators?

13            MR. KITZINGER:  Yes.  And the selection inspectors and

14   the interpreters and the door clerks, all 36,000 poll workers

15   are to get trained, so.  That --

16            THE COURT:  All 36,000 get trained in terms of the

17   need for the disabled?

18            MR. KITZINGER:  Yes, yes.

19            MR. SEABORN:  Your Honor, we haven't seen evidence of

20   that in the record.

21            And also we're talking about 1400 poll sites.  CIDNY

22   could hold trainings in, say, each of the five boroughs, train

23   as many people as you can.  Each of those people that gets

24   trained becomes a poll site coordinator.  It's not perfection.

25   It's not something -- maybe there won't be a trained poll site

C8RZUNI2

coordinator at every site, but there will be something much
more than we have now, and we don't have that much time before
November.

    THE COURT:  All right.  There are 1400 polling places.

    MR. KITZINGER:  Approximately.

    THE COURT:  Approximately.  How many have had problems
at the polling site during the day of voting more than twice or
three times?

    MR. KITZINGER:  Accessibility problems?  I don't have
numbers on neighbor that.  Maybe Mr. Seaborn does.

    MR. SEABORN:  We have -- the numbers indicate that
about 70 percent of the poll sites have at least one
accessibility problem.  In terms of more than once, we don't
have those numbers as well.

    MR. KITZINGER:  That's --

    MR. SEABORN:  We're just looking at the surveys.

    MR. KITZINGER:  And that's extrapolating two of the
five boroughs.  They've done no surveying in the Bronx or
Staten Island.  Staten Island is different because it's a much
more car centric borough and has different set ups.

    MR. SEABORN:  And, your Honor, there could be some
margin of error.  This is -- these are random samples so we
have to take it with a grain of salt.  But it's year after
year, eight years of surveys indicate 70 percent year after
year have a variance.

C8RZUNI2

1           MR. KITZINGER:  And, your Honor, some of those are

2     structural problems which the Board is working to resolve.  The

3     Board is having ramps built at two schools, which are currently

4     inaccessible.  They're undertaking efforts.  They're spending

5     grant money dedicated to the Board for accessibility issues,

6     among other things.  To --

7           THE COURT:  Well, dedicated to the Board for

8     accessibility issues among other things.  How much of it went

9     to the accessibility issues?

10          MR. RICHMAN:  Your Honor, there were two types of

11    grants.  There was federal monies for temporary improvements.

12    That paid for the improved signage.  And I disagree with Mr.

13    Seaborn.  If CIDNY did share with me information, they know

14    since the HAVA monies came in, the installation of door bells,

15    the permanent signage has all been discussed openly and

16    publicly at board meetings, testimony before the city and state

17    legislative bodies.  CIDNY's been in the attendance.  These are

18    all pooled together.  And that's been using the temporary

19    monies, as well as cones, portable ramps, et cetera.

20          There's a state grant program as well which makes

21    permanent improvements.  Requirement for that is that we have

22    to be able to use the poll site for at least five years.  So

23    the Board made a conscious decision to invest that money in New

24    York City public school sites that are public sites, public --

25    that are poll sites, since by law we will always, I believe,

C8RZUNI2

have the right to use that as a site, and so we've done
everything from building ramps to at least in one instance
building an elevator, so that we're doing that.  Now is there
enough money there?  Initially, no, but we have -- in the
pipeline I believe it's a total of 78 or 80 sites that are
getting permanent improvements.  These are all at public school
buildings throughout the city.

          And the other issue I want to bring to the Judge's
attention is the concern we have for poll workers generally.
We need, for November's election, 36,000 poll workers.  If
anything is in the past an indication, we'll get about 26,000
to show up.  We have a gap.  We do not have enough standbys, we
do not have enough poll workers.  We've asked every civic group
to continue to recruit.  But in order to meet the requirement,
you just can't come in and be a poll worker.  You have to
attend the training class, you have to pass the test.  Several
hundred people at least in the last cycle for the presidential
primary and the June federal primary were unable to pass the
open book test.  They were not allowed to work.  I don't think
you're asking us to put people into the poll sites to serve the
voters who are not trained.

          But the idea of adding additional staff -- part of the
problem we have is we don't have enough to begin with.  If we
add another 1400, I don't believe we'll be able to recruit
those people.  And if anybody's willing now, we have openings.

C8RZUNI2

1    You do not have to come through the political party process as

2    to expected to fill the positions of door clerk, information

3    clerk, standby worker.  You can just apply and if you meet the

4    requirements, age 18, registered voter, take the class and pass

5    the test, you're going to be assigned on election day.  I can

6    guarantee that.  Because there is no doubt in my mind that

7    we're going to have seven to 10,000 vacancies.  We don't have a

8    standby pool that big now.  So if CIDNY has people who want to

9    work, we can put them to work on election day beginning

10   September 13th.  Even though not every poll site will be open,

11   I guarantee you that there will be need for poll workers.

12          So the idea that we have to now in some way contract

13   with them to reach out, that's not the right attitude.  The

14   attitude from every other civic group Citizen's Union, League

15   of Women Voters is engage with us along with recruiting poll

16   workers.  We do not have the authority, your Honor, to draft

17   people.  We have suggested to the state that we be allowed, if

18   you work as a poll worker for two elections in a given year,

19   you get an exemption from jury duty.  Then Chief Administrator

20   Judge, now the Chief Judge, has told me where I could take that

21   idea.  Judge Litman is very concerned about that.  But $200 a

22   day, and we're paying higher salaries of any poll worker

23   anywhere in the State of New York for an 18 hour day, does not

24   exactly engender that as an -- even in the current economy,

25   we're not overwhelmed with applicants.  And so that's something

C8RZUNI2

1        that we've been looking for.

2                Your Honor, I want you to be aware that to assign a

3        poll worker to a specific function -- to recruit them is a

4        difficult problem initially.  That's why all of our poll

5        workers are trained and multi-tasked.  The coordinator has a

6        full range of responsibilities.  But the same thing is the

7        process has to be done in a lawful manner.  We don't want to

8        deny anybody the right to vote, but also there still has to be

9        that accountability.  And Mr. Kitzinger said at the beginning

10       of the day, yes, you got to get the equipment set up, you got

11       to account for your ballots because at the end of the day you

12       want to account for those ballots too.  It's not good as a

13       matter of election administration to have unaccountable or

14       floating ballots out there at the end of the day.  That raises

15       questions of integrity.  That's why we're having the poll

16       workers trained throughout.  We've gone to a six hour training

17       class.  CIDNY provided us with the detailed materials.  The

18       manual is there.  It's in the short guide, in the long guide in

19       terms of accessibility issues.  We are very cognizant of our

20       obligations to try to fulfill all the responsibilities.  And it

21       not only applies to door clerks, it applies to foreign language

22       interpreters --

23               THE COURT:  I know.  I'm just looking at one narrow

24       aspect of the problem that you have to deal with generally.  I

25       understand that, but it's my narrow aspect, and it's the one

C8RZUNI2

1   that I have the jurisdiction to rule on.  And I do appreciate

2   that you do have other problems and other issues you have to

3   deal with.  But it's not clear to me that there isn't some way

4   that CIDNY can be of more assistance near term, as well as long

5   term that would make it easier for you, as opposed to just

6   shouldering all of this on your own.  And that's why I am

7   thinking that there has to be more coordination, more

8   cooperation, more interaction, and a cooperative attitude and

9   spirit, and I'm just not exactly sure how best to guarantee

10  that.

11          MR. RICHMAN:  Your Honor, I understand that.  I think

12  the problem we have is that, for example, in doing training --

13  the reason we train between 180 and 200 adjunct trainers is

14  because we do the training through the city.  We try to make it

15  as easy as possible for the poll workers.  It is not a central

16  location in each borough.  We are using public schools, church

17  halls.  We're doing -- trying to get the sites to doing two

18  classes a day since it's a six hour class beginning 10:00 a.m.,

19  and then an evening session beginning at 5:00 so that we can

20  try to get people in after work as well.  We're doing it on

21  weekends.  The idea that CIDNY would have the capability to

22  simultaneously train 150 classes at the same time, we know that

23  doesn't exist.  Because they don't have the resources now and

24  they've told us that.

25          So the idea that we have the idea to do a schedule,

C8RZUNI2

1    one in each borough, that's not -- going to be literally a drop

2    in the bucket.  What we need is that's why we developed the

3    plan to have CIDNY train the adjunct trainers and then, yes, it

4    is a telephone chain, but that's the only way to reach out and

5    try to get to 30,000 plus people who go to the classes, because

6    otherwise we can't do it.  And, again we're doing this in a

7    very narrow timeframe.  The election appointment year begins on

8    July 15th.  As soon as those appointments come in, the poll

9    worker, prospective poll workers are assigned to the training

10   classes.  We have to get that done.  And the last training

11   class I believe, as of now, is scheduled for the Friday before

12   the primary.  Because when initially it was scheduled for

13   September 11th, so we ended it the Friday, I believe it's the

14   7th.  And the reason being is that at that point you need to at

15   least make the assignments, get the people out there.  You

16   really just can't tell them the night before this is where

17   you're going.  And they have to take the test, we have to

18   grade, them make sure they pass them as well.  So the idea that

19   we're going to begin training -- the other part is there will

20   be very limited training only for replacement poll workers, new

21   poll workers between September 13th and November 6th.  The

22   election year, the cycle begins on July 15th.  The law requires

23   them to be trained once a cycle, and the time to do that has

24   been running now.  As we speak now, the training is ongoing for

25   this election cycle.  And again we have enough problems trying

C8RZUNI2

1    to get people to show up and go to the training, because there

2    it is a six hour course.  It is not the most scintillating

3    information to be shared.  But I think it's important because

4    we have certain responsibilities.  And the emphasis has been on

5    meeting our legal obligations, including the rights of persons

6    with disabilities to vote in an unimpeded manner.

7         So, your Honor, I don't know how, between now and

8    November, what else CIDNY can do at this point, other than what

9    they've done in terms of getting us prepared for this year.

10        MR. SEABORN:  Your Honor, if I could respond to that.

11   It's just about opening themselves up to meeting with CIDNY to

12   finding out what CIDNY can, indeed, do for them.  This

13   engagement, I like the fact that the Board of Elections has

14   used the term engagement.  CIDNY's been engaged on the Board

15   since 2003, and we are where we are today and because of it.

16   So I think there need to be something a little bit more formal.

17   We recognize there may be some openness now, but there needs to

18   be some sort of formalization of relationship so when CIDNY --

19   they could sit down and say we have the capacity to train X

20   amount of people in X boroughs between now and November.  They

21   need to share that information back and forth.  But without

22   having some sort of formalization of the relationship saying,

23   something from the Court saying, Board of Elections, you need

24   to work with CIDNY to do this, we're not going to get there.

25        THE COURT:  You mean, there's been less than cordial

C8RZUNI2

1   and collegial correspondence between the plaintiffs and the

2   defendants?

3          MR. SEABORN:  The correspondence has been just fine in

4   terms of being cordial.  There's been people attending

5   meetings, they've had contact back and forth.

6          In terms of actually doing something when complaints

7   are made, when CIDNY raises an issue, it's really the Board's

8   decision and nothing else.  So we want something that there's

9   openness --

10          THE COURT:  You want teeth.

11          MR. SEABORN:  Yes, exactly; something where the voice

12   is heard and CIDNY has a say.

13          MR. KITZINGER:  Your Honor, I can't begin to express

14   how inappropriate I think that would be.  CIDNY is a contractor

15   that has designations with State Board of Elections, contractor

16   with the City Board of Election.  And to give them oversight

17   authority over their principal would seem to be highly

18   inappropriate.

19          THE COURT:  It would be unusual, I'd certainly say

20   that.

21          MR. KITZINGER:  Yeah.  It's -- I just don't even know

22   how to properly express it, because it's such an unusual

23   suggestion to bring in -- to, basically, take something that's

24   been contracted to do a job, has been doing it, someone else

25   complains that the job isn't being done sufficiently, and then

C8RZUNI2

1    to give them additional authority over the principal, just

2    seems to me to be, at best, inappropriate, and at worst, create

3    a conflict.

4              MR. SEABORN:  Your Honor, just to be clear, we're not

5    asking for CIDNY to have oversight over any of its process.

6    The Court has oversight in our plan.  We're asking for either a

7    third party, special master or magistrate to have the

8    oversight.  It's just having a voice, having -- you know, we

9    could have a series of meetings and the parties could report

10   back to the Court.  In our long term plan, we've actually had

11   an idea to get a third-party expert, somebody like Michael

12   Waterstone out in California, or somebody here in New York.

13             THE COURT:  You know, California and New York are

14   pretty far apart, and they also have attitudinal differences.

15   So if we're going to go that route, it probably would be long

16   term somebody from the New York area.

17             But, you know, I understand what Mr. Kitzinger is

18   saying, I understand what Mr. Seaborn is saying, and I

19   understand that this problem is before me.  And I am just

20   trying to devise a way of facilitating the obligations of the

21   Board of Elections in this area, knowing that you have other

22   obligations in other areas in a way that is, bottom line, going

23   to increase and guarantee the ability of the disabled to vote.

24   And it's not -- I mean, it's such a unique situation.  How many

25   times a year do you go to the polls?

C8RZUNI2

1              MR. KITZINGER:  This year --

2              MR. RICHMAN:  Four times, your Honor.

3              MR. KITZINGER:  This year we have four elections.

4              But, yes, we understand the problem.  The Board has

5    taken great -- is making great efforts to ensure that everyone

6    has the ability to vote.  And things will come up.  We will

7    have bad weather.  We will have power failures.  We will have

8    devices that fail on election day.  When you're conducting this

9    many simultaneous events, it will happen.  The Board is making

10   every effort it can to minimize these disruptions.  And that

11   includes resurveying every site, finding many new sites, making

12   changes to sites.  For example, where schools have had double

13   doors -- I don't know the technical term for it -- but we have

14   two doors in the hallway with the bar in the middle, they're

15   ripping those out, reinforcing the top and putting two doors

16   together without the bar in the middle so it's now wide enough,

17   because those doors were 32 inches and you have to have 36

18   inches clearance.

19             The Board is spending money to make improvements to

20   properties it doesn't own.  And it's very -- we all know in

21   this day and age there is limited resources.  But the Board is

22   prioritizing the resource it has to get the most bang for its

23   buck, including making sites accessible that are used by the

24   public on a daily basis that are also used for poll sites such

25   as the schools.  Because that benefits everybody by making the

C8RZUNI2

 1   poll sites accessible -- not just the voters who get an

 2   accessible site, but the students, the parents of the students,

 3   the teachers, they now have an additional accessible facility.

 4            THE COURT:  All that admirable.

 5            This is what I'm going to do.  It is 12:20.  I am

 6   going to have the parties talk to each other, exchange

 7   information so that you have a better idea of what each person

 8   wishes to do, short-term, for November.  It may be that with

 9   the information, that the new information the defendants have

10   to share with the plaintiffs, that some of the concerns may be

11   alleviated, some of them may not.  But because Mr. Kitzinger is

12   only available today, I want to use the remainder of the day

13   for this open discussion among the parties so that when Mr.

14   Kitzinger is back from vacation, which will be when?

15            MR. KITZINGER:  The day after Labor Day, that Tuesday.

16   I think it is September 4, your Honor.

17            THE COURT:  We're going to reconvene on Monday,

18   September 10th, 11:00 a.m.

19            MR. KITZINGER:  Your Honor, did you say 11:00?

20            THE COURT:  11:00 a.m.

21            MR. KITZINGER:  Thank you.

22            THE COURT:  So that gives you not only the remainder

23   of the day, but additional days the week of the 4th to get

24   together and talk and work out things that are helpful, with

25   open minds, with full knowledge of what each could do, with

C8RZUNI2

1   full knowledge much how each can help, so that when you appear

2   before me on the 10th, I will be in a better position to know

3   whether or not some more formal relationship imposed by the

4   Court is the only alternative.  All right?

5              MR. KITZINGER:  Thank you, your Honor.

6              THE COURT:  All right.

7              You can actually use my courtroom.

8              This matter is adjourned.

9              (Adjourned to September 10, 2012 at 11:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25